**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| PAUL NICOL,<br><br>        Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>        Defendant. | CASE NO. 4:25-CV-0513-BYP<br><br>DISTRICT JUDGE BENITA Y. PEARSON<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**REPORT AND RECOMMENDATION** |

Plaintiff Paul Nicol ("Plaintiff" or "Mr. Nicol") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Child's Insurance Benefits ("CIB")[1] and Supplemental Security Income ("SSI").  (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

## I.  Procedural History

On December 8, 2022, Mr. Nicol filed applications for CIB and SSI, alleging a disability onset date of September 1, 2018.  (Tr. 265-66, 272-74.)  He alleged disability beginning on August 18, 2018.  (Tr. 265, 309.)  Mr. Nichol alleged disability due to a bipolar disorder, anxiety, tobacco use disorder, learning disability, spinal stenosis lumbar region L1-L8, asthma,

---

[1] Under the authority of the Social Security Act, the Social Security Administration has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is 18 years old or older and has a disability that began before attaining age 22 (20 C.F.R. § 404.350(a)(5)).

and diabetes.  (Tr. 265, 309.)  Mr. Nicol's applications were denied at the initial level (Tr. 131, 136) and upon reconsideration (Tr. 143, 147), and he requested a hearing (Tr. 150-51).  On April 2, 2024, a hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 37-58.)  During the hearing, Plaintiff amended his alleged onset date to August 28, 2021.[2] (Tr. 42, 59.)

On May 1, 2024, the ALJ issued a decision, finding Mr. Nicol had not been under a disability within the meaning of the Social Security Act from August 27, 2021, through the date of the decision.  (Tr. 20-31.)  Mr. Nicol sought review of the decision by the Appeals Council. (Tr. 232-33.)  On February 6, 2025, the Appeals Council found no reason to review the decision, making the May 1, 2024 decision the final decision of the Commissioner.  (Tr. 1-6.)  On March 14, 2025, Mr. Nicol filed a Complaint challenging the Commissioner's final decision denying benefits.  (ECF Doc. 1.)  The matter is fully briefed.  (ECF Docs. 9, 11, & 12.)

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Mr. Nicol was born in 1977 and was 43 years old on the amended alleged disability onset date, making him a younger individual under Social Security regulations on the alleged onset date.  (Tr. 30.)  He had at least a high school education.  (*Id*.)

### B.     Relevant Medical and Educational Evidence

While the ALJ found Mr. Nicol had various mental and physical impairments (Tr. 20), Mr. Nicol only challenges the ALJ's physical RFC determination (ECF Docs. 9, 12).  The medical records summarized herein are therefore limited to evidence pertaining to Mr. Nicol's physical impairments and his ability to manage those impairments.

---

[2] A prior ALJ decision found him not disabled from 2018 through August 27, 2021.  (Tr. 72-73.)

### 1.      Education and Treatment Records

#### i.      Educational Records

On March 18, 1987, when Mr. Nicol was 9 years old, his test results for the Wechsler

Intelligence Scale for Children-Revised (WISC-R) included a verbal IQ score of 77, performance

IQ of 104, and full-scale IQ of 88, which is generally within the low average to average range of

ability.  (Tr. 388.)  On September 15, 1992, when Mr. Nicol was 14 years old, his test results for

the Wechsler Intelligence Scale for Children-III (WISC-III) included a verbal IQ score of 72, a

performance IQ score of 81, and a full-scale IQ score of 75, which is the borderline range of

intellectual ability.  (Tr. 373.)

#### ii.      Mental Health Treatment Records

Throughout the relevant period, Mr. Nicol received mental health medication

management through Valley Counseling Services.  (Tr. 486-518, 903-23.)  He was treated for:

unspecified anxiety disorder; bipolar I disorder unspecified; unspecified disruptive, impulse-

control and conduct disorder; and tobacco use disorder.  (Tr. 486, 491, 496, 501, 507, 513.)

Notes also indicate his learning disability.  (*Id*.)  Throughout this period, notes indicate his

mental condition was stable, and his medications—Wellbutrin, Risperdal, Topamax, and

Vistaril—were unchanged.  (*Id*., Tr. 504, 510, 516, 903, 913, 920-21.)  In May 2023, Mr. Nicol

received a psychiatric diagnostic evaluation diagnosing bipolar disorder, generalized anxiety

disorder, and tobacco use disorder.  (Tr. 903-08.)

#### iii.      Physical Treatment Records

On October 27, 2021, Mr. Nicol saw his primary care provider, Dr. Slemons, because he

had not been feeling well, had diarrhea, and was weak.  (Tr. 559.)   He reported forgetfulness,

headaches, and periods of episodic confusion.  (Tr. 559, 562.)  He reported his lowest blood

sugar reading was 92, and Dr. Slemons was concerned he "may be getting some hypoglycemia as his A1c in July was 6.6." (Tr. 562.) His examination noted morbid obesity, but otherwise normal findings. (*Id*.) Dr. Slemons ordered a metabolic panel, lipid panel, and A1c. (*Id*.)

On November 22, 2021, Mr. Nicol had a telehealth follow up appointment with Dr. Slemons. (Tr. 557.) He reported a blood sugar reading of 85 early that morning. (*Id*.) Dr. Slemons noted "he feels well he looks well…. In summary this patient is doing quite well no changes in his care plan." (Tr. 557-58.)

On March 22, 2022, Mr. Nicol returned to Dr. Slemons and requested a prescription for a wheeled walker with a seat. (Tr. 549.) Dr. Slemons noted that Mr. Nicols had "a workup by his orthopedic surgeon" with no hip or pelvis issues "but he does have some lumbar spine stenosis and herniated disc disease this is compound[ed] by his BMI over 40." (Tr. 552.) On examination, Dr. Slemons noted morbid obesity and tenderness and limited range of motion in the lumbar spine, but otherwise normal findings. (*Id*.) Dr. Slemons described Mr. Nicol as "doing well," and prescribed a walker rollator, explaining, "I feel that this is medically necessary for him to maneuver himself in and out of cars in situations. I do not want him to rely on it but it will help him with his back pain and for ambulation and safety." (Tr. 553.)

On July 26, 2022, Mr. Nicol followed up with Dr. Slemons and reported "some left shoulder pain." (Tr. 537.) He also reported beginning to smoke again, about one-half pack a day. (*Id*.) Except for morbid obesity, examination results were normal, including normal gait, ambulation, and memory. (Tr. 537-38.) Dr. Slemons opined that Mr. Nicol was medically stable, other than his shoulder issues, and referred him to his orthopedic surgeon for an x-ray. (Tr. 538.) Dr. Slemons added Gabapentin as a medication. (Tr. 534.)

4

On October 4, 2022, Mr. Nicol saw Dr. Slemons for bacterial sinusitis, cough, and congestion.  (Tr. 532.)  Dr. Slemons noted "I think it is exacerbated by his obesity and his nicotine dependence."  (*Id.*)  Examination showed morbid obesity with a BMI of 47.1, sinus tenderness, and purulent nasal discharge, and otherwise normal findings, including normal ambulation, gait, and memory.  (Tr. 529, 532.)

On November 15, 2022, Mr. Nicol had a follow up with Dr. Slemons, who indicated that he would "support him for a disability determination" because of his obesity, depression, and "difficulty with intermittent low back pain and ambulation."  (Tr. 527.)  He also noted that Mr. Nicol's diabetic neuropathy inhibited the fine motor movements of his hands and feet.  (Tr. 528.)  Dr. Slemons noted Mr. Nicol's labs were stable, but he had been unable to lose weight, and his insurance did not cover bariatric surgery.  (Tr. 527.)  Except for morbid obesity, examination results were normal, including normal gait, ambulation, and memory.  (Tr. 527-28.)

On December 2, 2022, Mr. Nicol went to the ER due to headache and shortness of breath after being exposed to carbon monoxide and smoke in a house for at least 30 minutes.  (Tr. 681, 685.)  His pain level was 7/10.  (Tr. 683.)  Examination results were normal except for wheezing and anxiousness.  (Tr. 682.)  He was diagnosed with carbon monoxide exposure, shortness of breath, smoke inhalation, and chronic obstructive pulmonary disease. (Tr. 685.)  The doctor wanted to re-run his blood tests due to clotting, but Mr. Nicol reported "feeling much better" and chose to go home.  (*Id.*)

Mr. Nicol returned to Dr. Slemons on January 10, 2023, reporting left arm/shoulder pain "consistent since the weekend," that limited his range of motion, with a pain level of 7/10.  (Tr. 519.)  Although Mr. Nicol had been experiencing pain since July, Dr. Slemons noted that x-rays were negative, and his pain had appeared to improve with home exercises; he now reported

experiencing pain that interfered with his sleep at night and his range of motion.  (Tr. 522.)  He was using a heating pad and Tylenol and Meloxicam with no relief, so Dr. Slemons referred him for occupational therapy ("OT") and an orthopedic consultation.  (Tr. 519, 522.)  Mr. Nicol also reported some hypoglycemic events with his sugars going below 70; Dr. Slemons reduced his metformin to once per day.  (Tr. 522.)  He also reported intermittent peripheral neuropathy relating to his diabetes and some pain in his feet despite taking Gabapentin.  (*Id*.)  Examination results were normal, except for morbid obesity, shoulder tenderness, pain with range of motion of the left shoulder, and some crepitance in the anterior shoulder girdle.  (Tr. 522- 23.)

Mr. Nicol was evaluated for OT on January 17, 2023.  (Tr. 667.)  He reported left shoulder pain at a level of 8/10, aggravated by reaching tasks, leisure tasks (playing pool), sleeping tasks, and household tasks.  (Tr. 667-68.)  He reported use of a rollator walker at home for safety when doing household tasks.  (Tr. 668.)  Examination of the left shoulder revealed decreased strength of 4/5 in flexion and internal rotation and 3+/5 in abduction and external rotation.  (Tr. 668.)  His range of motion was reduced with flexion at 120 degrees and abduction at 122 degrees.  (*Id*.)

On May 5, 2023, Mr. Nicol went to the ER with blood sugars fluctuating between 122 and 157, a temperature up to 100 degrees, and a headache with a pain level at 6/10.  (Tr. 654.)  He reported not taking his mediation for bipolar disorder and having mood swings.  (*Id*.)  Examination results were normal, except for elevated blood pressure at 180/105.  (Tr. 655-56.)  He was diagnosed with a headache and hypertension, given clonidine, and advised to treat his headache with Tylenol at home.  (Tr. 656-57.)

On May 16, 2023, Mr. Nicol returned to Dr. Slemons and reported high blood pressure, "not watching his sugar control real well," and having to call the ambulance several times,

although they only took him to the hospital once.  (Tr. 842, 845.)  Examination results were in

the normal range, except for morbid obesity.  (Tr. 845-56.)  Dr. Slemons prescribed Losartan 50

mg for hypertension and a Dexcom sensor device to help with testing blood sugars.  (Tr. 846.)

On July 24, 2023, Mr. Nicol had a follow-up appointment with Dr. Slemons and reported

low blood sugar of around 40 and having "a hard time managing his blood sugar" even with the

use of Dexcom.  (Tr. 898, 901.)  In particular, he reported difficulty in raising his blood sugar

when it dropped.  (Tr. 898.)  Examination findings were normal, except for morbid obesity.  (Tr.

901-02.)  Dr. Slemons stated that he would consider putting Mr. Nicol on Ozempic.  (Tr. 901.)

Dr. Slemons indicated that Mr. Nicol "does have likely COPD" and advised him to quit smoking.

(Tr. 901.)  He also recommended that Mr. Nicols curtail his drinking of sugar sodas, as he

reported drinking 1 to 2 liters of soda daily.  (Tr. 902.)  Dr. Slemons assessed type 2 diabetes

uncontrolled, BMI over 40, chronic depression, COPD, and nicotine dependence.  (Tr. 902.)

On August 31, 2023, Mr. Nicol reported to his mental healthcare provider, Melody Boals,

CNS, that Dr. Slemons had stopped Meloxicam and started him on Celebrex.  (Tr. 911.)  Mental

status examination findings were normal.  (Tr. 912.)

On September 23, 2023, Mr. Nicol went to the ER because he was "forgetting to take his

medications at home which are his psychiatric medications. He states that he feels bummed out

about this. He does physically have his medication at home but just can not remember to take

them." (Tr. 872.)  He had no physical complaints.  (*Id*.)  Examination results were in the normal

range, and he was described as "calm" with a "normal affect."  (Tr. 873-74.)  The clinician

assessed "no emergency at this time," and Mr. Nicol was discharged with advice to go home and

take his medications.  (Tr. 874.)

On October 2, 2023, Mr. Nicol returned to the ER for evaluation of left flank pain that had been at a level of 5/10 for the past day.  (Tr. 862.)  His glucose level was high at 180.  (Tr. 863.)  Urinalysis revealed large amount of blood with greater than 100 RBCs 0-5 WBCs and few bacteria.  (Tr. 865.)  The clinician suspected he had passed a kidney stone, noted that his symptoms had improved, and advised him to follow up with his primary care provider. (*Id*.)

On October 27, 2023, Mr. Nicol reported to Dr. Slemons that he forgot to complete laboratory testing and refill his medications, and that his food stamps had been cut off.  (Tr. 887.)  He also reported that back pain continued to bother him.  (Tr. 890.)  Dr. Slemons noted, "I think his weight is a big hindrance to that."  (*Id*.)  Examination results were normal, except for morbid obesity with a BMI of 48.4, lumbar tenderness, and lumbar spine pain with extension and flexion.  (Tr. 890-91.)

### 2. Opinion Evidence

#### i. State Agency Medical Consultants

On February 19, 2023, James Cacchillo, M.D., reviewed the record, including Dr. Slemons's January 2023 treatment note, and agreed with the prior ALJ's August 27, 2021 finding that Mr. Nicol could perform light work.  (Tr. 81-84.)  On August 10, 2023, Mehr Siddiqui, M.D., reviewed the record, including Dr. Slemons's treatment notes from March and May 2023, and agreed with Dr. Cacchillo's assessment.  (Tr. 99-100, 103.)

#### ii. State Agency Psychological Consultants

On February 22, 2023, Shannon Ratzburg, Psy.D. reviewed the record and agreed with the prior ALJ's finding that Mr. Nicol could: perform simple, routine and repetitive tasks but not at a production rate pace (e.g., assembly line work); interact with supervisors, coworkers, and the public on an occasional basis; and tolerate few changes in a routine work setting.  (Tr. 81-82.)

8

On July 1, 2023, David Dietz, Ph.D., reviewed the record and agreed with Dr. Ratzburg's assessment.  (Tr. 103-04.)

## C.     Function Report

On January 11, 2023, Mr. Nicol completed a function report with the assistance of his case manager.  (Tr. 327-34.)   He explained that he was unable to work because he could only stand for five to ten minutes because of his spinal stenosis and was not able to be around other people very long because of his mental health issues.  (*Id.*)  He reported that he forgot to take his medications even though he knew it was important.  (Tr. 328.)  He used his walker to complete household chores like cleaning up and laundry.  (*Id.*)  He went outside once an hour to smoke, and shopped for groceries weekly, but otherwise stayed in his apartment.  (Tr. 330.)  He did not drive because of his anger issues.  (*Id.*)  He could walk about a quarter mile before needing to rest for 5 minutes, was easily distracted, and had trouble following directions because he forgot them.  (Tr. 333.)

## D.     Hearing Testimony

### 1.     Plaintiff's Testimony

At the hearing on April 2, 2024, Mr. Nicol testified that he lived alone in an apartment. (Tr. 43.)  He once had a driving learner's permit but never had a license because he was unable to pass the driving test.  (Tr. 44.)  He received food stamps and Medicaid and relied on his aunt to pay the rent for his apartment because he had no income.  (*Id.*)  He worked as an eyeglass polisher for twelve and a half years but was fired in August 2018 because of his attendance and his inability to get along with co-workers.  (Tr. 45, 47.)  When he became his mother's caregiver in 2020 and was lifting her out of bed and helping her move, his back pain got much worse.  (Tr. 46-47.)  He said he was unable to work because he had trouble getting along with coworkers, did

not adapt to change easily, could not stand for more than an hour due to his back pain, and had trouble controlling his anger and anxiety. (Tr. 47-49.) He stayed in his apartment most of the day, watching tv and playing on his phone, and occasionally played games with four or five neighbors in the common area of his apartment complex. (Tr. 49-50.) He tried to go to church on Sundays but had a hard time getting a ride. (*Id.*) He ran a lightweight sweeper and did his dishes but had a hard time motivating himself to do it. (Tr. 50.) He used Walmart delivery for groceries so that he did not have to travel to a store. (*Id.*)

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified that a hypothetical individual of Mr. Nicol's age, education, and work experience, with the functional limitations described in the ALJ's RFC determination could perform Mr. Nicol's past work as an eyeglass frames polisher. (Tr. 55-55.) He also testified that this hypothetical individual could perform other jobs including housekeeping cleaner, mail clerk, and office helper. (Tr. 55.) The VE also testified that it would preclude competitive work if the hypothetical individual would be off task for 20 percent of the day, continuing throughout the length of the employment. (*Id.*) If that individual missed one day of work per week on an ongoing basis, that would also eliminate all competitive work. (*Id.*)

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to

do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a

five-step sequential analysis set out in agency regulations, summarized as follows:

1.     If the claimant is doing substantial gainful activity, he is not disabled.

2.     If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.     If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.     If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.     If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).  Under this

sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters*

*v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors

to perform other work available in the national economy.  *Id.*

### IV.     The ALJ's Decision

In her May 1, 2024 decision, the ALJ made the following findings:[3]

---

[3] The ALJ's findings are summarized.

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2023.  (Tr. 20.)

2.      The claimant has not engaged in substantial gainful activity since August 28, 2021, the amended alleged onset date.  (*Id.*)

3.      The claimant has the following severe impairments: Depression, Anxiety, Bipolar disorder, Borderline intellectual functioning, Obesity, Degenerative disc disease, Degenerative joint disease of the knees, Left shoulder disorder, and Diabetes.  (*Id.*)

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*)

5.      The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: He can occasionally reach overhead with the left upper extremity. He can never climb ladders, ropes, or scaffolds. The claimant is able to perform simple, routine, and repetitive tasks, but not at a production rate pace (e.g. assembly line work). He is able to interact with coworkers and supervisors occasionally and can never interact with the public. The claimant is able to tolerate few changes in a routine work setting.  (Tr. 24.)

6.      The claimant is capable of performing past relevant work as a Lab Worker-Eye Glass Frames Polisher. This work does not require the performance of work-related activities precluded by the claimant's RFC.  (Tr. 29.)

Based on the foregoing, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from August 28, 2021, through the date of the decision on May 1, 2024.  (Tr. 31.)

## V.      Plaintiff's Arguments

In his first assignment of error, Mr. Nicol argues that the ALJ's residual functional capacity ("RFC") assessment is the product of legal error and unsupported by substantial evidence because the ALJ: (1) failed to meaningfully discuss hypoglycemia relating to Plaintiff's diabetes and include corresponding limitations in the RFC; and (2) failed to explain why she included an overhead reaching limitation for Mr. Nicol's left shoulder impairment without also

limiting his reaching in other directions.  (ECF Doc. 9, pp. 12-20.)  In his second assignment of error, Mr. Nicol argues that the ALJ failed to properly consider relevant evidence relating to his morbid obesity when assessing the RFC.  (*Id.* at pp. 21-24.)

## VI.    Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide

questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## A.     First Assignment of Error: The ALJ Adequately Evaluated Plaintiff's Diabetes and Left Shoulder Disorder in Formulating the Physical RFC

In his first assignment of error, Mr. Nicol challenges the ALJ's physical RFC assessment on two grounds.  First, he argues that the ALJ did not meaningfully discuss instances of hypoglycemia caused by Plaintiff's diabetes or include corresponding limitations in the RFC. (ECF Doc. 9, pp. 14-20.)   Second, he argues that the ALJ did not adequately explain why she included an overhead reaching limitation based on Plaintiff's left shoulder impairment but did not also limit his reaching in other directions.  (*Id.* at pp. 14, 20-23.)  The Commissioner responds that the ALJ adequately considered and accounted for Plaintiff's hypoglycemia and left shoulder condition.  (ECF Doc. 11, pp. 7-10.)  The two arguments will be assessed in turn.

A claimant's "residual functional capacity is the most [he] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1).  "The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1546(c), 416.946(c)); *see also id.* ("[A]n ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding.").  An ALJ must assess a claimant's "residual functional capacity based on all the relevant evidence in [the] case record," 20 C.F.R. § 404.1545(a)(1), such as: medical history; medical signs and laboratory findings; the effects of treatment; reports of daily activities; lay evidence; recorded observations; medical source statements; effects of symptoms; evidence from attempts to work; need for a structured living environment; and work evaluations, *see* SSR 96-8p, *Assessing Residual Functional Capacity in Initial Claims*, 61 Fed. Reg. 34474, 34477 (July 2, 1996).

The claimant bears the burden to prove the residual functional capacity.  *See Napier v. Comm'r of Soc. Sec.*, 127 F.4th 1000, 1003 (6th Cir. 2025) (stating the claimant bears the burden of proof in the first four steps of the sequential analysis, while the burden shifts to the Commissioner at step five); *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 392 (6th Cir. 1999) (rejecting argument that the burden of proving the RFC shifts to the Commissioner at step five).

### 1.     The ALJ Adequately Evaluated Plaintiff's Diabetes and Hypoglycemia

Mr. Nicol argues that the ALJ did not adequately address his diabetes at Step Four because she did not "meaningfully explain how [she] accounted for [his] hypoglycemic events in the RFC" and did not "indicate how Plaintiff's severe impairment of borderline intellectual functioning impact[ed] Plaintiff's ability to respond to blood sugar fluctuations."  (ECF Doc. 9, pp. 17-20.)  The Commissioner responds that Plaintiff's citation to "a couple of instances where

15

he had low blood sugars" is insufficient to meet his burden to prove he had functional limitations arising from hypoglycemia, highlighting the fact that Mr. Nicol "never mentioned his diabetes or hypoglycemia" when asked what prevented him from working.  (ECF Doc. 11, pp. 8-9.)

The ALJ discussed Mr. Nicol's diabetes at various points in her decision.  At Step Two, she found diabetes was a severe impairment and said she considered all medically determinable impairments in assessing the RFC.  (Tr. 20.)  At Step Three, she found no evidence showing Mr. Nicol's diabetic impairment had resulted in any "systemic dysfunction of listing-level severity." (Tr. 21.)  At Step Four, she acknowledged Mr. Nicol's complaints that "[d]iabetes results in headaches and blood sugar fluctuations" and that "[t]here was one hospital visit for blood sugar issues" (Tr. 24), but found his complaints "not entirely consistent with the medical evidence and other evidence in the record" (Tr. 25) and described the relevant medical records as follows:

> The claimant had uncontrolled diabetes at the time of the prior decision. (B1A) Current records show that he continues to treat this condition with a primary care source. He has had some hypoglycemic events. He needed adjustments of metformin. He gets some intermittent peripheral neuropathy associated with diabetes, which was not documented in the prior decision. He takes gabapentin occasionally, including when he gets his nails clipped because it causes some pain in his feet. (B7F/15) In late 2021, A1c was 6.2%. (B6F/123) In April 2023, A1c was 6.6%. There are no further A1c labs. (B6F/7) In July 2023, the claimant was encouraged to cut out the sugary sodas. His provider considered starting Ozempic in the future, based on lab results. (B9F/16) At the most recent follow up in October 2023, the claimant admitted he never went for labs. He was given a new referral. Vital signs were stable. Sensation remained intact despite the diabetic neuropathy. Musculoskeletal and neurologic exams were normal. Body mass index was 48. (B9F/1-6) This condition contributes to the need for light work.

(Tr. 28.)  She then addressed the medical opinions of the state agency medical consultants, finding them partially persuasive and "generally consistent with the records available for review," but highlighted "evidence of worsening diabetes that now causes intermittent neuropathy in the feet" before finding "additional limitations in . . . climbing[.]"  (Tr. 28-29.)

16

Mr. Nicol argues that this discussion of his diabetes was inadequate because the ALJ failed to specifically explain how she accounted for his hypoglycemic events in the RFC.  (ECF Doc. 9, p. 18.)  In support, he cites to primary care visits where he reported instances of low blood sugar to Dr. Slemons and/or was diagnosed with hypoglycemia or uncontrolled diabetes (*id.* at pp. 16-17 (citing Tr. 522, 557, 559, 563, 845-46, 891, 898, 901, 902)), an ER visit where he presented with fluctuating blood sugars and was diagnosed with hypertension and headache (*id.* at p. 16 (citing Tr. 654, 657)), a complaint of increased headaches (*id.* at p. 17 (citing Tr. 911)), one laboratory result showing high blood sugar (*id.* (citing Tr. 863)), Plaintiff's report to Dr. Slemons that he was having a hard time managing his blood sugars, even with a Dexcom sensor device (*id.* at p. 16 (citing Tr. 898, 901), and Plaintiff's statement in his function report that he had difficulty remembering when to take medication (*id.* at p. 17 (citing Tr. 328)).

While the ALJ clearly did not discuss every record or finding outlined in Plaintiff's brief, it is well established that an ALJ need not "discuss each piece of data in [her] opinion, so long as [she] consider[s] the evidence as a whole and reach[es] a reasoned conclusion."  *Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) (per curiam)).  A review of the ALJ's written decision reveals that she acknowledged his complaints of "headaches and blood sugar fluctuations" and his "one hospital visit for blood sugar issues" (Tr. 24) but found his complaints "not entirely consistent with the medical evidence and other evidence in the record" (Tr. 25) in light of records showing that he did not receive specialized care for his diabetes, his metformin was adjusted after hypoglycemic episodes, his A1c was 6.6% and 6.2%, he was drinking (and encouraged to cut out) sugary sodas, he did not get labs needed for an Ozempic prescription, and he had normal physical examination findings, aside from a 48 BMI (Tr. 28); she then concluded

that Plaintiff's "worsening diabetes" supported additional climbing limitations (Tr. 28-29).[4]  In this context, the undersigned finds Plaintiff has not met his burden to show that the ALJ's RFC findings lose the support of substantial evidence due to her failure to discuss the cited evidence.

As the Sixth Circuit explained, "'disability is determined by the functional limitations imposed by a condition, not the mere diagnosis of it.'"  *Dyson v. Comm'r of Soc. Sec.*, 786 F. App'x 586, 589 (6th Cir. 2019) (quoting *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014)).  The ALJ was therefore required to consider whether the "records shed light on [Plaintiff's] level of impairment during the relevant time."  *Dyson*, 786 F. App'x at 589.  Here, the ALJ acknowledged Mr. Nicol's hypoglycemic events, but noted that he received conservative care, his medications were adjusted, his physical examination findings were normal, he was drinking sugary sodas, and he did not get labs needed for additional prescriptions.  She then adopted a light RFC with limited climbing.  Plaintiff has failed to show that these limitations lacked the support of substantial evidence or that the evidence required greater limitations.

The cases cited by Mr. Nicols do not change this analysis.  The court in *Weiland v. Berryhill* found an ALJ failed to articulate "good reasons" for rejecting a treating opinion that limited the plaintiff's work hours when the ALJ did not address testimony regarding frequent blood sugar episodes and workplace accommodations for those episodes.  No. 1:17CV727, 2018 WL 1750461, at *18 (N.D. Ohio Feb. 28, 2018), *report and recommendation adopted*, No. 17-CV-727, 2018 WL 1744810 (N.D. Ohio Apr. 11, 2018).  Here, the record contains no such medical opinion evidence and no such testimony.

---

[4] Plaintiff's argument that "the ALJ fail[ed] to link" the climbing limitation "to Plaintiff's diabetes with hypoglycemia" (ECF Doc. 9, p. 18) is not well taken.  The new or worsening conditions identified by the ALJ were diabetes, a shoulder disorder, and "anger and irritability," while the added limitations were in reaching, climbing, and socializing.  No further explanation is needed to understand which condition is associated with which limitation.

18

The court in *Diaz v. Berryhill* upheld an RFC limiting exposure to climbing and hazards and providing for one absence per month, concluding that the RFC appropriately accounted for treatment records showing dramatically fluctuating blood sugar levels and testimony that the plaintiff's blood sugar dropped 2-3 times per week and "he had a severe hypoglycemic episode each month."  No. 1:17CV1602, 2018 WL 2338864, at *12-13 (N.D. Ohio May 8, 2018), *report and recommendation adopted sub nom.*, *Diaz v. Comm'r Soc. Sec.*, 2018 WL 2336806 (N.D. Ohio May 23, 2018).  Neither the medical records in this case nor Mr. Nicol's testimony align with that evidence.  Moreover, another court's finding that substantial evidence supported a different RFC based on different evidence has no bearing on whether substantial evidence supports the findings here.

Finally, Mr. Nicol argues that the ALJ erred when she "neglect[ed] to indicate how Plaintiff's severe impairment of borderline intellectual functioning impacts Plaintiff's ability to respond to blood sugar fluctuations."  (ECF Doc. 9, p. 19.)  In support, he cites his own report to Dr. Slemons in May 2023 that he was having a hard time managing his blood sugars (*id.* (citing Tr. 898, 901)) and Dr. Slemons's notation in March 2021 that "I do feel this patient has disabilities in relationship to his back due to his morbid obesity and he certainly does have some developmental delay mentally also which I think is hindering his ability to work" (*id.* (citing Tr. 581)).  But neither of the cited records establishes a clear link between Mr. Nicol's borderline intellectual functioning and his ability to manage his diabetes.  Further, while the ALJ does not explicitly discuss any potential link between Mr. Nicol's borderline intellectual functioning and his ability to manage his diabetes, she does: find borderline intellectual functioning to be a severe impairment (Tr. 20); explain her reasons for finding moderate limitations in understanding, remembering, and applying information, considering Plaintiff's IQ scores and past unskilled

work (Tr. 22); acknowledge his reported history of learning disorder and assistance from a case manager, but also his reports that he lives independently, cooks in a microwave, cleans, and does laundry (Tr. 24); discuss his IQ scores and mental health treatment records, highlighting his limited treatment and normal mental status exams (Tr. 25-26); and find the state agency opinions that Plaintiff can perform simple, routine, repetitive tasks partially persuasive and adopt those same limitations (Tr. 28-29).  In this context, where the ALJ considered Mr. Nicol's diabetes, hypoglycemic episodes, and borderline intellectual functioning, the undersigned finds Mr. Nicol has not shown that the ALJ's failure to discuss the impact of his intellectual impairment on his ability to manage his diabetes deprived the RFC of the support of substantial evidence.

While Mr. Nicol may disagree with the ALJ's decision not to adopt additional RFC limitations based on his hypoglycemic episodes, he has failed to show that the ALJ's findings lacked the support of substantial evidence.  *See Jones*, 336 F.3d at 477 (finding a court cannot overturn the Commissioner's decision, even if substantial evidence supports the claimant's position, "so long as substantial evidence also supports the conclusion reached by the ALJ").

For the reasons set forth above, the undersigned concludes that Mr. Nicol has not met his burden to show that the ALJ lacked substantial evidence or failed to build a logical bridge between the evidence and the result when she evaluated Nr. Nicol's diabetes at Step Four.

### 2.    The ALJ Adequately Addressed Plaintiff's Left Shoulder Disorder

Mr. Nicol next argues that the ALJ did not adequately address his left shoulder disorder at Step Four because she adopted an RFC limiting him to occasional overhead reaching but "failed to explain how she arrived at a conclusion that Plaintiff was limited only in reaching overhead and not in all other directions[.]"  (ECF Doc. 9, p. 21.)  Plaintiff also asserts that the RCF lacks the support of substantial evidence because the new left shoulder impairment was not considered in the state agency medical opinions, arguing based on a line of cases following

20

*Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908 (N.D. Ohio 2008), that the ALJ's RFC findings were an improper lay opinion based on raw medical data.  (*Id.* at pp. 21-22.)

The Commissioner responds that Mr. Nicol has not met his burden to show that his left shoulder disorder required additional functional limitations, noting that Plaintiff testified his left shoulder improved with physical therapy.  (ECF Doc. 11, p. 9.)  He also argues that the standard in *Deskin* and associated cases is not consistent with Sixth Circuit precedent.  (*Id.* at pp. 9-10.)

Turning to the written decision, the ALJ discussed the Plaintiff's left shoulder disorder at various points.  At Step Two, she found the left shoulder disorder to be a severe impairment and said she considered all medically determinable impairments in assessing the RFC.  (Tr. 20.)  At Step Four, she acknowledged Mr. Nicol's complaints regarding "left shoulder pain that limits reaching" (Tr. 24) but found his complaints "not entirely consistent with the medical evidence and other evidence in the record" (Tr. 25) and described the relevant evidence as follows:

> Since the prior decision, the claimant was treated for new left shoulder pain. Exams showed reduced range of motion, crepitus in the anterior shoulder girdle, and negative drop sign. Heat and Tylenol did not help. (B5F/1, 5) Imaging of the left shoulder was normal in July 2022. (B3F/5; B5F/97; B6F/49) A primary care source gave the claimant some home exercises and anti0inflammatory [sic] medication in July 2022. In January 2023, the claimant followed up with primary care and reported ongoing pain in the left shoulder. This provider noted, "x-rays were negative….he has been bothered by this especially sleeping at night. He has pain with range of motion. He does take meloxicam. I am going to add some occupational therapy and have him see Dr. Boniface. He prescribed gabapentin for diabetic neuropathy, and noted it would help with pain. (B7F/15) The record does not show any visits to Dr. Boniface for shoulder pain. However, the claimant did see an occupational therapist and obtain a home exercise plan in January 2023.  (B6F/15-18) There was no further significant treatment for shoulder pain. Although the imaging was normal, the claimant did have clinical abnormalities and pain. Based on the x-rays, exams, and conservative treatment, the undersigned finds that the claimant is limited to occasional reaching with the left upper extremity. This condition also contributes to a need for light work.

(Tr. 27-28.)  She then addressed the medical opinions of the state agency medical consultants, finding them partially persuasive and "generally consistent with the records available for

review," but noted "there is a new shoulder disorder since the prior decision" before finding "additional limitations in left overhead reaching" to be appropriate.  (Tr. 28-29.)

Mr. Nicol argues that the ALJ offered an inadequate explanation for the RFC limitations she adopted in relation to the left shoulder disorder.  (ECF Doc. 9, p. 21.)  In support, he cites to office notes from a primary care visit with Dr. Slemons in January 2023 and an occupational therapy evaluation later that month.  (*Id.* (citing Tr. 519, 522-23, 667-68).)  Notably, the ALJ cited and discussed the same records in her analysis.  (Tr. 27-28 (citing Tr. 519, 523, 667-70, 856 (dup. of 522)).)  Plaintiff argues that the cited medical records and his subjective complaints "document[] pain with all ranges of motion, not just overhead."  (ECF Doc. 9, p. 21.)  But the ALJ acknowledged those complaints of pain and limited range of motion, then weighed them against the normal x-ray images and conservative treatment records to find the impairment warranted an RFC limitation to light work with additional overhead reaching limitations.

It was the ALJ's responsibility to determine Mr. Nicol's RFC based on the relevant evidence in the case record, and she did so.  *See Poe*, 342 F. App'x at 157; 20 C.F.R. § 404.1545(a)(1); SSR 96-8p, 61 Fed. Reg. at 34477.  Based upon a review of the evidence and the ALJ's written decision, the undersigned concludes that the ALJ adequately explained her reasons for adopting RFC limitations relating to Mr. Nicol's left shoulder disorder and adopted limitations that are supported by substantial evidence.  Conversely, Mr. Nicol has not met his burden to show that that the RCF limitations lacked the support of substantial evidence or that the evidence required the ALJ to adopt greater limitations.

Plaintiff's argument that the ALJ exceeded her authority when she adopted functional limitations for his left shoulder impairment because the impairment "was not addressed by the opinions of the state agency reviewing consultants" (ECF Doc. 9, p. 22) lacks merit for multiple

reasons.  First, a review of the state agency medical consultants' opinions reveals that they both considered Mr. Nicol's unremarkable left shoulder x-rays and January 2023 office visit with Dr. Slemons before adopting medical opinions regarding Mr. Nicol's RFC.  (*See* Tr. 81-84, 91-94, 109-13.)  Thus, the ALJ did not adopt left shoulder limitations in the absence of a relevant medical opinion; instead, the ALJ adopted left shoulder limitations that the medical sources themselves did not find necessary in their medical opinions, despite considering some, if not all, of the same medical records now cited by Plaintiff.

Second, even if the state agency reviewers had not considered the evidence regarding Plaintiff's left shoulder impairment, the line of cases on which Plaintiff bases his argument have been called into question and found to conflict with Sixth Circuit precedent.  *See, e.g., Carr v. Comm'r of Soc. Sec.*, No. 5:23-CV-00187-BMB, 2024 WL 1556398, at *11 (N.D. Ohio Jan. 8, 2024) ("A review of Sixth Circuit caselaw supports a finding that *Deskin* is not consistent with governing precedent.") (collecting cases), *report and recommendation adopted*, No. 5:23-CV-00187, 2024 WL 1343473 (N.D. Ohio Mar. 30, 2024) ("District courts in this circuit have declined to follow *Deskin* and *Kizys*. . . .  So, too, does this Court.") (collecting cases); *Winans v. Comm'r of Soc. Sec.*, No. 5:22-CV-01793, 2023 WL 7622634, at *4 (N.D. Ohio November 15, 2023) ("*Deskin* is a non-binding district court decision that conflicts with the regulations and Sixth Circuit case law. . . .  By requiring an ALJ to secure a medical opinion whenever the record does not contain such an opinion, subject to only limited exceptions, *Deskin* places a higher burden on the ALJ than the Sixth Circuit does.").

Third, even if *Deskin* were applicable here, the same court explained that the standard should be applied narrowly, only where the relevant medical opinions do not account for "critical body of objective evidence."  *Kizys v. Comm'r of Soc. Sec*. No. 3:10 CV 25, 2011 WL 5024866,

23

at *1–2 (N.D. Ohio Oct. 21, 2011).  Here, Mr. Nicol has not identified what, if any, objective

evidence was not considered by the state agency consultants, and the administrative record

indicates that the consultants considered both his unremarkable x-rays and January 2023 office

visit with Dr. Slemons.  But even if the consultants did not consider any of the evidence relating

to Mr. Nicol's shoulder, abnormal physical examination findings in one primary care visit and

one occupational therapy evaluation, paired with negative x-rays and no ongoing treatment, does

not amount to a "critical body of objective evidence" that warrants remand for evaluation by a

medical expert.  For all of the reasons specified above, the undersigned concludes that the record

does not support a finding either that the ALJ was required to obtain additional medical opinion

evidence or that she exceeded her authority when she found Plaintiff more limited than the state

agency medical consultants opined and added left overhead reaching limitations to the RFC.

 Mr. Nicol's additional assertion that the ALJ made inconsistent statements regarding her

left shoulder limitations also does not change the analysis.  Although the ALJ adopted an RFC

limiting Plaintiff to "occasionally reach[ing] overhead with his left upper extremity" (Tr. 24) and

specified in her discussion of the state agency opinions that she found "that there are additional

limitations in left overhead reaching" (Tr. 29), Plaintiff is correct that the ALJ's discussion of the

medical records concludes with a finding that he "is limited to occasional reaching with the left

upper extremity" (Tr. 28), without specifying that the limitation only applies to "overhead"

reaching.  (*See* ECF Doc. 9, p. 21.)  Nevertheless, it is clear from both the ALJ's RFC (Tr. 24)

and the VE testimony on which that RFC is based (Tr. 54-55) that the ALJ only contemplated an

RFC with restrictions in overhead reaching, not reaching in all directions.  The single reference

to "occasional reaching with the left upper extremity" (Tr. 28) was a harmless typographical

error that does not deprive the ALJ's RFC findings of the support of substantial evidence.  *See*

*Draine v. Comm'r of Soc. Sec.*, No. 1:22-CV-1370, 2024 WL 1014030, at *24 (N.D. Ohio Mar. 8, 2024) (finding harmless error when an initial statement that an opinion was "persuasive" was clearly a typographical error); *see also Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) (finding harmless error analysis applies in the social security disability context).

For the reasons set forth above, the undersigned concludes that Mr. Nicol has not met his burden to show that the ALJ lacked substantial evidence or failed to build a logical bridge between the evidence and the result when she evaluated Mr. Nicol's left shoulder disorder at Step Four.  Accordingly, the undersigned finds the first assignment of error is without merit.

**B.      Second Assignment of Error: The ALJ Appropriately Evaluated Plaintiff's Obesity**

In his second assignment of error, Mr. Nicol argues that the ALJ failed to properly consider the evidence relating to his obesity because she "failed to consider several statements made by primary care provider Dr. Slemons who opined that Plaintiff's obesity results in significant functional limitations and greatly exacerbates his back condition."[5]  (ECF Doc. 9, p. 24.)  In response, the Commissioner asserts that "the ALJ either considered and accounted for this evidence, or else had no duty to discuss the evidence in question."  (ECF Doc. 11, pp. 11-13.)  The undersigned will address each of the statements in turn.

In the first statement highlighted by Plaintiff, Dr. Slemons wrote in the history section of his notes for a March 4, 2021 primary care visit:

> I am going to fill out paperwork for his housing.  He does have disability with his weight[,] his back[,] and mobility.  I think this will qualify him for getting and [sic] the housing through the disability verification.

---

[5] Plaintiff did not develop or clearly articulate any argument that the identified statements by Dr. Slemons amounted to "medical opinions" that the ALJ was required to evaluate for persuasiveness.  (*See* ECF Doc. 9, pp. 23-27.)  To the extent any such argument was intended, the undersigned finds the argument has been waived.  *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.").

(Tr. 580; *see* ECF Doc. 9, p. 24.)   The Commissioner correctly argues that the ALJ did not have a duty to discuss this statement.   (ECF Doc. 11, p. 12.)   The regulations clearly establish that "[s]tatements on issues reserved to the Commissioner" such as to whether a person is or is not "disabled, . . . able to work, or able to perform regular or continuing work" are "inherently neither valuable nor persuasive" and ALJs are therefore not required to "provide any analysis about how [they] considered such evidence in [their] determination or decision."   20 C.F.R. § 404.1520b(c)(3)(i).   The statement also predates the alleged onset date, falling during a period when Plaintiff was found not disabled in a prior, binding ALJ decision.   (*See* Tr. 62-73.)

In the second statement highlighted by Plaintiff, Dr. Slemons wrote in the history section of his notes for a March 22, 2022 primary care visit:

> The patient did get a workup by his orthopedic surgeon he does not have really any hip or pelvis issues but he does have some lumbar spine stenosis and herniated disc disease this is compounded by his BMI over 40. He is going to get a Rollator with a walker with a seat and hopefully this will assist in getting out of car. I do not want him to really become dependent upon it though I want him to try to continue to diet exercise walk as much as possible to improve his weight that will improve his back . . .

(Tr. 552; *see* ECF Doc. 9, p. 24.)   He then went on to state in his discussion notes:

> In summary this patient is doing well we are going to give him a slip for a walker Rollator I feel that this is medically necessary for him to maneuver himself in and out of cars in situations. I do not want him to rely on it but it will help him with his back pain and for ambulation and safety.

(Tr. 553.)   The Commissioner argues that the ALJ adequately considered and discussed Dr. Slemons walker prescription in her analysis.   (ECF Doc. 11, p. 12.)   Indeed, the ALJ included a detailed discussion of this medical record twice in her written decision, first in support of her Step Three finding that Plaintiff does not meet or medically equal Listings 1.15, 1.16, and 1.18 (Tr. 20-21) and again in support of her RFC findings at Step Four (Tr. 27).   She explained:

> In regard to allegations of a need for a walker, the claimant asked for a prescription for a wheeled seated walker during a March 2022 primary care visit. The provider

> agreed to write the prescription, but specifically noted that it should only be used to assist in getting out of the car, and that he did not want the claimant to become dependent on it. (B5F/31-35) The undersigned acknowledges this prescription, but notes that it was not the provider's recommendation, but rather the claimant's request. Further, it was only to be used for the narrow reason of getting in and out of the car, and not for ambulation. As noted above, gait was consistently normal. Additionally, the claimant did not need or use ambulatory aids at any subsequent medical visits, further supporting a finding that the walker is not medically necessary. For those reasons, the undersigned does not find that this prescription is necessary for ambulation. Based on the generally normal clinical exams, no updated imaging, very conservative care with medication from primary care, and morbid obesity, the undersigned finds that the record continues to support a light exertional capacity. There is an additional limitation of no climbing of ladders, ropes or scaffolds due to pain and obesity.

(Tr. 27.) Thus, the ALJ clearly considered the relevant medical record and provided a detailed explanation for the weight she gave to that record in assessing the impact of Mr. Nicol's obesity on his RFC. Mr. Nicol certainly has not met his burden to demonstrate otherwise.

In the third statement highlighted by Mr. Nicol, Dr. Slemons wrote in the history section of his notes for a November 15, 2022 primary care visit:

> this patient in my opinion because of his obesity [h]is depression his difficulty with intermittent low back pain and ambulation is not able to work. I would support him for disability determination.

(Tr. 527; *see* ECF Doc. 9, p. 24.) He went on to state in his discussion notes:

> I do recommend this patient to continue to pursue disability for his depression anxiety focus he is unable to really focus had a clean a job his BMI of 47 hinders him for macro early getting around properly.

(Tr. 528.) The Commissioner again correctly notes that the ALJ was not required to provide any analysis of Dr. Slemons's "[s]tatements on issues reserved to the Commissioner" such as to whether Plaintiff was "disabled, . . . able to work, or able to perform regular or continuing work." 20 C.F.R. § 404.1520b(c)(3)(i); (*see* ECF Doc. 11, p. 13). As to Dr. Slemons's statements suggesting that Plaintiff's obesity impacted his ability to "get[] around properly," the

Commissioner argues that the ALJ adequately considered the impact of Plaintiff's obesity on his ability to ambulate.  (ECF Doc. 11, p. 13 (citing Tr. 21, 27).)

In the final statement highlighted by Mr. Nicol, Dr. Slemons wrote in the history section of his notes for an October 27, 2023 primary care visit: "[H]is back continues to bother him. I think his weight is a big hindrance to that."  (Tr. 890; *see* ECF Doc. 9, pp. 24-25.)  The Commissioner argues in response that the ALJ adequately accounted for the combined impact of Plaintiff's weight and back pain.  (ECF Doc. 11, p. 13 (citing Tr. 21, 27).)

A review of the written decision reveals that the ALJ discussed her consideration of Mr. Nicol's obesity in various places.  At Step Two, she found obesity was a severe impairment and said she considered all medically determinable impairments in assessing the RFC.  (Tr. 20.)  At Step Three, she acknowledged that obesity does not have its own listing, noted that she had considered the limitations imposed by obesity in keeping with SSR 19-2p, and specifically found: "[i]n this case, <u>obesity contributes to pain</u>, resulting in exertional and postural limitations in combination with other physical impairments."  (Tr. 21 (emphasis added).)  At Step Four, she acknowledged Plaintiff's complaints of worsening back pain (Tr. 24), but found his complaints were "not entirely consistent with the medical evidence and other evidence in the record" (Tr. 25) and described the relevant medical records as follows:

> Current records do not show significant changes in the spine and knee impairments. There is no new imaging since the prior decision. Exams consistently showed normal gait, strength, sensation, and reflexes. <u>Body mass index was consistent with morbid obesity</u>. (B5F/5, 10, 14, 20, 29, 44; B6F/12, 55, 61, 112; B7F/5, 10, 16; B9F/5, 16) Straight leg raise was negative. (B6F/3) <u>The claimant was advised to lose weight to help with pain</u>. (B9F/5)
>
> In regard to allegations of a need for a walker, the claimant asked for a prescription for a wheeled seated walker during a March 2022 primary care visit. The provider agreed to write the prescription, but specifically noted that it should only be used to assist in getting out of the car, and that he did not want the claimant to become dependent on it. (B5F/31-35) The undersigned acknowledges this prescription, but notes that it was not the provider's recommendation, but rather the claimant's

28

request. Further, it was only to be used for the narrow reason of getting in and out of the car, and not for ambulation. As noted above, gait was consistently normal. Additionally, the claimant did not need or use ambulatory aids at any subsequent medical visits, further supporting a finding that the walker is not medically necessary. For those reasons, the undersigned does not find that this prescription is necessary for ambulation. Based on the generally normal clinical exams, no updated imaging, very conservative care with medication from primary care, and morbid obesity, the undersigned finds that the record continues to support a light exertional capacity. There is an additional limitation of no climbing of ladders, ropes or scaffolds due to pain and obesity.

(Tr. 27 (emphasis added).)  She then addressed the opinions of the state agency medical consultants, finding them partially persuasive and "generally consistent with the records available for review," and adopting their proposed limitation to light work while adding limitations in climbing and reaching overhead with the left upper extremity.  (Tr. 28-29.)

While the ALJ did not explicitly discuss Dr. Slemons's statement in November 2022 that Plaintiff's "BMI of 47 hinders him for macro early getting around properly" (Tr. 528) or his statement in October 2023 that Plaintiff's "back continues to bother him. I think his weight is a big hindrance to that" (Tr. 890), she was not required to discuss every piece of evidence so long as she considered the evidence as a whole and reached a reasoned conclusion.  *See Boseley*, 397 F. App'x at 199.  Here, the ALJ's written decision adequately demonstrates that she considered the impact of Mr. Nicol's obesity on both his ability to ambulate and his back pain.  Plaintiff has therefore failed to demonstrate that the ALJ's failure to provide further discussion of Dr. Slemons's statements deprived her RFC findings of the support of substantial evidence.

For the reasons set forth above, the undersigned concludes that Mr. Nicol has not met his burden to show that the ALJ lacked substantial evidence or failed to build a logical bridge between the evidence and the result when she evaluated Nr. Nicol's obesity at Step Four. Accordingly, the undersigned finds the second assignment of error is without merit.

## VII.    Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the

Commissioner be **AFFIRMED**.


February 5, 2026

/s/Amanda M. Knapp
AMANDA M. KNAPP
United States Magistrate Judge



## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).